MAKAR, J.,
concurring.
After a pre-incarceration hearing involving pro se former spouses, the trial court held the former husband in contempt for willfully violating court orders to pay past-due alimony ($5,945.50) to his disabled former wife (who has “serious health issues requiring a special dietary formula through a feeding tube”) despite having the present ability to do so (he makes $175,000 yearly), sentencing him to just short of a year in jail. The trial court found that the former husband’s non-payment was “egregious,” if not worse (“The word evil comes to my mind. Greed comes to my mind.”). The trial court’s written order provided for a purge of contempt if the *788 former husband (a) repaid the past-due alimony via monthly $250 payments, plus (b) timely paid all future monthly alimony obligations, short of which the former husband would go to jail without another hearing.
Called into question is whether a second pre-incarceration hearing is required under due process principles, making it important to distinguish between future payment of future alimony obligations versus future payment of past-due, accrued alimony that formed the basis of the current contempt order (both forms of future payments are woven together in the order).
As to the future payment of future alimony, the order is faulty by failing to provide any hearing at all. It is necessary under basic principles of due process to accord notice and a pre-incarceration hearing because the former husband might encounter significant, unforeseen economic hardships in the future that might warrant judicial reconsideration of his ability to comply with a court order. See Hipschman v. Cochran, 683 So.2d 209, 212 (Fla. 4th DCA 1996) (en banc) (“For nonpayment of future support obligations, a hearing comporting with due process requirements is always necessary to determine both the fact of nonpayment and whether the defaulting payor has the ability to pay such amount before any incarceration may begin.”). On that basis, this portion of the order must be stricken; the former husband must be accorded due process via notice and hearing should contempt be sought as to his future non-payment of future alimony obligations. On this basis, such a hearing would not be a second pre-incarceration hearing; it would be the initial hearing on the issue of non-payment of future alimony obligations.
More nuanced is what pre-incarceration process is due if the former husband fails to make the monthly $250 payments for the $5,945.50 of past-due, accrued alimony that he willfully failed to pay, resulting in a finding of contempt. As discussed in Hipschman, a second pre-incarceration hearing is not legally required in all circumstances. Id. (noting that cases involving future payment of future obligations “are not analogous to the situation where incarceration is ordered for non-compliance with past, accrued and unpaid support obligations—i.e., arrearages”). For example, where a trial court determines after a contempt hearing that a former spouse “had not made court ordered payments and had the ability to purge within a short time frame .... due process does not automatically require a second hearing before arrest on the question of whether the contemnor has the ability to pay the purge amount.” Id. (noting that “[njeither constitutional principle, nor rule of procedure, nor common sense impose the requirement of an additional pre-in-carceration hearing on a busy trial court to reconsider fact issues already determined”). Nothing precludes a trial court from requiring payment immediately or within a “relatively brief purge period” provided adequate findings are made as to the present ability to pay immediately or during such period. Id. Thus, had the order in this case concluded that the former husband had the present ability to either make full payment immediately in a lump sum or, alternatively, via a series of partial payments over a “relatively brief’ period of time, a second pre-incarceration hearing would be unnecessary. Though the trial court concluded that the former husband “had and continues to have the ability to pay the amounts owed,” it required the payment of $250 monthly over almost 24 months, which exceeds what would ordinarily be deemed a “relatively brief purge period.” Much can happen in two years.
*789 More importantly, the trial court’s order put in the former wife’s hands the ability to trigger the former husband’s incarceration without due process. As discussed in Hipschman, holding a second pre-incarcer-ation hearing is “indispensable” such as where a judicial contempt order:
specifies compliance extra-judicially, i.e., by performance outside the auspices of the court or its adjuncts. Here, the court ordered the husband to make his purge payment directly to the wife. We believe that in this instance the court must allow an additional, pre-incarceration hearing on whether the contemnor has actually complied during the purge period. This is necessary to avoid the situation where the moving party misrepresents whether performance has been sufficient to comply, an occasion might arise in a hotly contested ease where the temptation is great to use the court’s coercive powers for the movant’s own ends.
Id. at 212-13 (footnotes omitted). Because the trial court’s order placed its enforcement solely in the former wife’s control (she need only file an affidavit of noncompliance and contact the case manager), and explicitly dispensed with any judicial review via a hearing, it is defective. Though the file in this case reflects that many judges have expended much time, effort, and patience on the ongoing post-dissolution disputes between the former spouses, the requirement of a pre-incareer-ation hearing cannot be put aside except under narrow and carefully delineated circumstances, such as those discussed in Hipschman.
Finally, the former husband claims that the trial judge’s “compulsion” to assist the dual pro se litigants went astray to his disadvantage, for instance, “by not only seizing [former husband’s] pleading and ‘redrafting’ it into an impossible absurdity that even Lewis Carrol would find amusing, but then seizing and truncating the presentation of the case and any evidence to support it.” Using golf parlance, he ruminates whether the trial judge has “wanderfed] hopeless into the rough along the fairway” by perhaps “nudgfing] the ball back onto the fairway to speed play for the judge’s own preference.” Oddly, he does not mention the characterization of his non-payment of alimony as “evil,” focusing instead on perceived slights (that the record shows the trial judge did not make) for which he claims entitlement to a do-over. In golf lingo, this claim is a whiff (swinging at and entirely missing the ball) for which no mulligan (a second chance) is allowed.